2006 DSD 11

**PLAINS COMMERCE BANK, Plaintiff,**

v.

**LONG FAMILY LAND AND CATTLE COMPANY, INC., and Ronnie and Lila Long, Defendants.**

**No. CIV. 05–3002.**

United States District Court, D. South Dakota, Central Division.

July 17, 2006.

Robert V. Atmore, Lindquist & Vennum PLLP, Minneapolis, MN; and David A. Von Wald, Von Wald Law Offices, Hoven, SD, for Plaintiff Plains Commerce Bank.

James P. Hurley, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, SD, for Defendants Long Family Land and Cattle Co., Inc., et al.

Steven J. Gunn, Washington University School of Law, Roger K. Heidenreich, Sonnenschein Nath & Rosenthal LLP, St. Louis, MO, and Thomas J. Van Norman, Cheyenne River Sioux Tribe Legal Department, Eagle Butte, SD, for Cheyenne River Sioux Tribe as Amicus Curiae.

## MEMORANDUM OPINION AND ORDER

KORNMANN, District Judge.

[¶ 1] Plains Commerce Bank ("bank") filed this action under 28 U.S.C. § 2201 seeking declaratory relief against the Long Family Land and Cattle Company, Inc. ("Long Company") and Ronnie and Lila Long. On December 1, 2005, cross motions for summary judgment were filed by the bank (Doc. 28) and the defendants (Doc. 33).

## BACKGROUND

[¶ 2] The bank, formerly known as Bank of Hoven, is a South Dakota banking corporation with its principal place of business located in Potter County, South Dakota. The Long Company is a South Dakota chartered family farm corporation with its principal place of business in Dewey County, South Dakota, on the Cheyenne River Sioux Tribe ("CRST") Indian Reservation. Ronnie Long ("Ronnie") is the son of Kenneth ("Kenneth") and the late Maxine ("Maxine") Long. Ronnie's wife is Lila ("Lila") Long. Ronnie and Lila are both members of the CRST, as was Maxine before her death. Kenneth was not a member of the CRST.

[¶ 3] The bank provided Kenneth and the Long Company with various loans. It is undisputed that CRST members have at

all times relevant owned at least 51% of the outstanding stock in the Long Company. Native American control of the Long Company was required in order to qualify for Bureau of Indian Affairs ("BIA") guarantees of the loans of the bank to the Long Company. *See* 25 C.F.R. § 103.7. Some of the Long Company's loans from the bank were guaranteed by the BIA.

[¶ 4] Prior to his death on July 17, 1995, Kenneth owned 2,230 acres of deeded agricultural land located within the CRST Indian Reservation. He also owned 49% of the Long Company. The land was used in the Long Company's farming and ranching operation. Kenneth had mortgaged this land and his home in Timber Lake to the bank to secure loans for the Long Company's operations. In his will, Kenneth purported to devise his land and his shares in the Long Company to his four children. Ronnie's brothers and sisters sought to assign all of their interests in the land and the company to Ronnie. The Longs thus claim that Ronnie inherited and controlled all of Kenneth's land and his 49% interest in the Long Company, thereby giving Ronnie and Lila 100% ownership of the Long Company.

[¶ 5] The bank claims that neither Ronnie nor any of Kenneth's children inherited his Dewey County real estate or his 49% interest in the Long Company. Kenneth's estate is being probated in the Circuit Court for the Eighth Judicial Circuit, Dewey County, South Dakota. Kenneth and the Long Company owed approximately $750,000 to the bank at the time of Kenneth's death. This amount greatly exceeded the value of the assets of Kenneth's estate. The bank filed a creditor's claim against Kenneth's estate on September 26, 1995. Kenneth's second wife, Paulette Long ("Paulette"), was appointed personal representative of the estate, and she eventually deeded the real estate to the bank in lieu of foreclosure, as discussed below.

The bank claims that Kenneth's 49% interest in the Long Company was never distributed by the Circuit Court. The probate estate remains open.

[¶ 6] In the spring of 1996, an officer of the bank came on the Longs' land on the CRST Reservation and inspected the land, cattle, hay, and machinery. Discussions concerning a new loan agreement took place among bank officers, Ronnie and Lila, and CRST Tribal officers at the CRST Tribal offices on the CRST Reservation. There were discussions involving a deed in lieu of foreclosure, in which Kenneth's land and house would be deeded to the bank, and, in return, the bank would credit $478,000 against the debt owed by Kenneth and the Long Company to the bank. The Longs claim that the bank proposed at that time that it would finance the sale of the Longs' land back to the Longs via a 20 year contract for deed. The bank claims that, although it was discussed, it did not propose a new loan agreement during that visit and nothing was reduced to writing.

[¶ 7] The Longs claim that the bank thereafter changed the "agreement." In a letter dated April 26, 1996, the bank stated that, on the advice of counsel, it would not sell the land under a contract because of "possible jurisdictional problems if the bank ever had to foreclose on [the] land when it is contracted or leased to an Indian owned entity on the reservation." The bank claims that no agreement was in place up to that point in time. There are no documents that expressly set forth what the Longs claim they were offered by the bank.

[¶ 8] On December 5, 1996, a meeting occurred at the bank's office in Hoven, South Dakota. The bank and the Long Company entered into a two year lease which gave the Longs the option to purchase the land for $468,000 at the conclu-

sion of the lease. A part of this agreement involved Kenneth's estate, acting through Paulette, conveying the Dewey County real estate, as well as the house in Timber Lake, to the bank, in lieu of foreclosure. The Long Company's annual Crop Reserve Program (CRP) payments of approximately $44,198 were assigned to the bank for lease payments. The bank and the Long Company entered into a second document, entitled "Loan Agreement." This document stated that the Long Company would be credited $478,000 for the land and house conveyed by Kenneth's estate. Moreover, the document stated that the bank would do a number of things. The bank would request that the BIA increase the guarantee on one of the Long Company's existing loans to 90%. It would request a 90% BIA guarantee on a $70,000 operating loan to be used by the Longs to care for their cattle and crops. Also, if the BIA approved that request, the bank would loan the Longs $37,500 to purchase 110 calves to be fed and pastured with the Long Company's calves to increase income so it could buy back the land from the bank.

[¶ 9] The Longs claim that the bank breached this agreement by failing to make the operating loans it promised to make. Specifically, the bank never made the $70,000 operating loan or the $37,500 loan. According to the Longs, as a direct result of the bank's failure to make these loans, the Longs were unable to feed or care for their livestock during the severe winter of 1996–1997. The Court takes judicial notice of the terribly harsh winter of 1996–1997. The Longs' cattle were positioned in winter breaks about seven miles from Ronnie's house. Due to blizzards, roads were closed and the Longs were not able to feed their cattle. The Longs claimed the bank knew that the Longs did not have operating money to move their hay several miles to the cattle on Ronnie Long's Indian range unit. The Longs lost

230 cows, 277 yearlings, and 8 horses during the winter of 1996–1997. Obviously, this resulted in a great amount of loss to the Long Company.

[¶ 10] Conversely, the bank claims that it made application to the BIA for the various guarantees set forth in the loan agreement of December 12, 1996. The bank received no response from the BIA until February 14, 1997, but when it did receive a response, the BIA asked that a more formal application be made. This was not done. The bank contends that it was not automatically required to make the operating loans. Rather, its promise was contingent on the BIA approving its requests. The bank argues that it did make various loans to the Long Company. On December 10, 1996, the bank loaned the Long Company $16,718.46 to pay for tribal leases for the 1997 grazing year. On December 14, 1996, the bank loaned the Long Company an additional $5,000 for operating expenses and $2,250 for the purchase of a snowmobile to get feed to the cattle.

[¶ 11] Due to the cattle losses and resulting economic circumstances, the Longs lacked the financial resources to exercise their option to purchase the land. On December 5, 1998, the lease expired. The Longs did not vacate the land. Nonetheless, on March 17, 1999, the bank sold 320 acres to Mr. and Mrs. Ralph Pesicka. In June of 1999, the Bank sent a letter to the CRST Court requesting that the CRST Court serve a Notice to Quit on Ronnie describing the entire 2,230 acres. The CRST Court accommodated the bank. The request was approved ex parte by Chief Judge Leisah Bluespruce on June 15, 1999, and was served on the Longs by the CRST Court on June 16, 1999. On June 29, 1999, the bank sold the remaining 1,905 acres to Edward and May Jo

Mackjewski on a contract for deed.[1] Why a judge or a court would become involved on behalf of one party to serve a notice to quit is not understandable. The responsibility to prepare and see to the service of a notice to quit lies with the party seeking to start the process to evict a party.

[¶ 12] The Long Company then commenced an action in tribal court seeking a temporary restraining order restraining the bank from selling the land to the Mackjewski's. The bank moved to dismiss, claiming that the tribal court lacked subject matter jurisdiction. Both the bank's motion to dismiss and the Longs' motion for a restraining order were denied. The Longs then amended the complaint to include several causes of action against the bank that sought damages and other relief. The bank counterclaimed seeking eviction of the Longs and damages.

[¶ 13] A two day jury trial was held on December 6, 2002, and December 11, 2002, before Tribal Judge B.J. Jones. Jones is a member of the State Bar of South Dakota. The jury returned a verdict in favor of the Longs on their claims that the bank breached the loan agreement, discriminated against the Longs based on their status as Indians, and acted in bad faith with regard to its dealings with the Longs. The jury awarded the Longs $750,000 plus prejudgment interest, calculated in the amount of $123,131. Judge Jones gave the Long Company the option to purchase the remaining 960 acres owned by the bank for the sum of $201,600. Both parties appealed, and the trial court decision was affirmed in all respects, including on the jurisdictional grounds raised by the bank.

[¶ 14] The bank has filed a motion for summary judgment (Doc. 28) seeking a declaratory judgment that the CRST Court lacked subject matter jurisdiction over it in the matter of *Long Family Land and Cattle Company Inc. et al. v. Edward and Mary Maciejewski, et al.* The bank also claims that the CRST Court and CRST Court of Appeals denied it due process of law. The Long Company filed a motion for summary judgment (Doc. 33) requesting that the Court enter summary judgment declaring that the CRST Court had jurisdiction to enter the judgment previously discussed.

## DECISION

[¶ 15] The summary judgment standard is well known and has been set forth by this court in numerous opinions. *See Hanson v. North Star Mutual Insurance Co.*, 1999 DSD 334 ¶ 8, 71 F.Supp.2d 1007, 1009–1010 (D.S.D.1999), *Gardner v. Trip County*, 1998 DSD 38 ¶ 8, 66 F.Supp.2d 1094, 1098 (D.S.D.1998), *Patterson Farm, Inc. v. City of Britton*, 1998 DSD 34 ¶ 7, 22 F.Supp.2d 1085, 1088–89 (D.S.D.1998), and *Smith v. Horton Industries*, 1998 DSD 26 ¶ 2, 17 F.Supp.2d 1094, 1095 (D.S.D.1998). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c); *Donaho v. FMC Corp.*, 74 F.3d 894, 898 (8th Cir.1996). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir.1995).

## I. Jurisdiction

[¶ 16] Tribal courts must in appropriate cases be given the first opportunity to determine whether the tribal court has the power to exercise jurisdiction over non-Indians. *Nat'l Farmers Union Ins. Companies v. Crow Tribe of Indians*, 471 U.S. 845, 856–57, 105 S.Ct. 2447, 2454, 85 L.Ed.2d 818 (1985). A district court may

---

1. Neither the Pesickas nor the Mackjewskis    are members of the CRST.

perform a *de novo* review of a tribal court's determination of its own jurisdiction. *Duncan Energy Co. v. Three Affiliated Tribes of Ft. Berthold Reservation,* 27 F.3d 1294, 1300 (8th Cir.1994), *cert. denied,* 513 U.S. 1103, 115 S.Ct. 779, 130 L.Ed.2d 673 (1995), (*citing Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 19, 107 S.Ct. 971, 978, 94 L.Ed.2d 10 (1987)). The Court of Appeals for the Eighth Circuit has likewise recognized that federal district courts in appropriate cases should not consider a case until tribal court remedies have been exhausted. *Id.* In some cases not falling within the Tribe's inherent sovereign authority, there is no exhaustion requirement because the tribal court simply lacks authority to adjudicate disputes arising from such conduct. *See Hornell Brewing Co. v. Rosebud Sioux Tribal Court,* 133 F.3d 1087 (8th Cir.1998). Because both parties participated fully in tribal proceedings, and the issue of jurisdiction was explored by the tribal courts, the question of jurisdiction can now be reviewed by this court. *Nat'l Farmers Union Ins. Co.,* 471 U.S. at 856, 105 S.Ct. at 2454, *Duncan Energy,* 27 F.3d at 1300, and *United States ex rel. Kishell v. Turtle Mountain Hous. Auth.,* 816 F.2d 1273, 1276 (8th Cir.1987) (stating that " ... a federal court should stay its hand until tribal remedies are exhausted and the tribal court has had a full opportunity to determine its own jurisdiction ... ").

■■ [¶ 17] "Our case law establishes that, absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of non-members exists only in limited circumstances." *Strate v. A-1 Contractors,* 520 U.S. 438, 445, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997).[2] In *Montana v. United States,* the United States Supreme Court held that the inherent sovereign powers of an Indian tribe do not, as a general proposition, extend to the activities of non-members of the tribe. 450 U.S. 544, 565–66, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). The Court described two instances in which tribes could exercise such sovereignty. First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases, or other arrangements." *Id.* Second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe." *Id.* at 566, 101 S.Ct. 1245.

[¶ 18] The CRST tribal court considered whether it had subject matter jurisdiction. It concluded that it did have the requisite jurisdiction to hear the lawsuit filed by the Longs, and, as discussed above, judgment was ultimately entered against the bank pursuant to the jury's verdict. The bank appealed to the CRST Court of Appeals, where CRST Chief Judge Frank Pommersheim and Associate Justices Everett Dupris and Patrick Lee considered the jurisdictional arguments, along with the bank's other arguments.

[¶ 19] Interestingly, on appeal, the bank asked the CRST Court of Appeals to consider a very narrow issue. It did not generally challenge the jurisdiction of the CRST Tribal Court over the lawsuit brought by the Longs against the bank. Rather, relying on *Nevada v. Hicks,* 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), it challenged the tribal court's subject matter jurisdiction only as to the discrimination cause of action, claiming that tribal courts do not have jurisdiction over

---

**2.** Neither party makes mention of any federal statute or treaty conferring subject matter jurisdiction over the Longs' claims in the tribal court.

federal causes of action. The CRST Court of Appeals rendered a written opinion in which it determined that the Longs' discrimination claim is grounded in tribal, not federal, law. Accordingly, the CRST Court of Appeals concluded that the tribal court properly exercised jurisdiction over the case, reasoning as follows:

> This case is the prototype for a consensual agreement as it involves a signed contract between a tribal member and a non-Indian bank. The contract deals solely with fee land located wholly within the exterior boundaries of the reservation. Fee land that was originally owned by the Longs, but owned by the Bank during the controverted events in this lawsuit. All bank loans in this matter were provided solely for the ranching operation by the Longs taking place on the Bank's land within the reservation. Numerous meetings of the Bank with the Longs, with Cheyenne River Sioux Tribal Officials, and Bureau of Indian Affairs personnel took place on the reservation, both when the land was owned by the Longs and subsequently when it was owned by the Bank.
>
> \*   \*   \*   \*   \*   \*
>
> In addition, the case clearly involves the "economic security" of the tribe in that the Cheyenne River Sioux Tribe (along with the Bureau of Indian Affairs) was a direct participant actively consulted by both the Longs *and* the Bank seeking economic data and support relevant to the cattle operation on the Longs' land. If the economic security of the Tribe was not involved, the tribe would not have played such a large role in these events in seeking to support and advance the opportunity for Tribal members to succeed in their ranching operation on the Reservation.

Doc. 36, Attach. 16, page 10.

[¶ 20] Indeed, the issue presented here is whether this lawsuit falls within one of the *Montana* exceptions. The Longs seem to focus most on the first *Montana* exception; their reliance on it will be discussed below. Amicus continues to urge that the second exception is equally applicable. As the Supreme Court noted in *Strate*, the key to the proper application of the second *Montana* exception is a recognition that " 'Indian tribes retain their inherent power [to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members ... But [a tribe's inherent power does not reach] beyond what is necessary to protect tribal self-government or to control internal relations.' " *Strate*, 520 U.S. at 459, 117 S.Ct. 1404 (*quoting Montana*, 450 U.S. at 564, 101 S.Ct. 1245). The fact that the Long Company is owned by tribal members does not, in and of itself, translate to a finding that the dealings between the bank and the Longs necessarily have an effect on the political integrity, economic security, or the health and welfare of the tribe. If taken to this extreme, tribal jurisdiction would exist in any circumstance where a private entity conducts business with a tribal member. This is clearly not the law as described in *Montana* and *Strate*.

[¶ 21] The written submissions by the Longs focus largely on the first exception discussed in *Montana*, namely the "consensual relationship" exception. The Longs argue that the bank entered into consensual relationships with Ronnie and Lila Long, who are tribal members, and with the Long corporation when the corporate stock was at all times owned 51% by CRST members. The bank seems to argue that, since the Long Company is a South Dakota corporation, it is not a tribal member. Therefore, the relationship between the bank and the Long Company was nothing more than a relationship between two non-member corporations. This assessment, although perhaps techni-

cally correct since a corporation apparently cannot be incorporated tribally, very much ignores important facts of this case. The Long Company is a closely held corporation. CRST members have controlled at least 51% of the Long Company's outstanding stock at all times pertinent to this action. Native American control was necessary in order for the Long Company to qualify for BIA guarantees. The BIA guarantees allowed the bank to make loans to the Longs with greatly reduced risk.[3] In fact, after the Longs' cattle died, the bank was able to submit a claim on the BIA guarantees, and the bank received $392,968.55 from the BIA. Simply stated, the loan agreements between the bank and the Long Company were not only crafted with tribal membership in mind; they would not likely have been possible without it.

■ [¶ 22] The bank cites *Hornell Brewing Co.*, where the Eighth Circuit noted that "[n]either *Montana* nor its progeny purports to allow Indian tribes to exercise civil jurisdiction over the activities or conduct of non-Indians occurring *outside their reservations*." 133 F.3d at 1091 (emphasis in original). I was the lower court judge in *Hornell*. The bank's argument is somewhat misplaced. In *Hornell*, the dispute centered on an alcoholic beverage styled "The Original Crazy Horse Malt Liquor." The brewery responsible for the beverage did not manufacture, sell, or distribute the malt liquor on the Rosebud Sioux Reservation, and the Court of Appeals specifically noted that Montana's discussion of activities of non-Indians on fee land within a reservation was irrelevant under the facts of that case. "The mere fact that a member of a tribe or a

tribe itself has a cultural interest in conduct occurring outside a reservation does not create jurisdiction of a tribal court under its powers of limited inherent sovereignty." *Id.* at 1091. *Hornell* is readily distinguishable from the facts of the instant case. Most notably, *Hornell* did not involve the consensual relationship criteria. It involved the question of whether the malt liquor's use of the "Crazy Horse" name had an effect on the political integrity, economic security, or the health and welfare of the tribe. The instant case involves a non-member's direct contractual involvement with a Native American owned corporate entity and concerns land located wholly within the boundaries of the CRST reservation.

■ [¶ 23] Assuming for the moment that tribal tort law was applied, as the CRST appellate court concluded, there are other matters which must be considered in determining whether the tribal courts properly considered the case under the consensual relationship exception. In *Strate*, 520 U.S. at 457, 117 S.Ct. 1404, the Supreme Court identified several cases which fall within this exception. *See e.g. Washington v. Confederated Tribes of Colville Reservation*, 447 U.S. 134, 152–54, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) (tribal authority to tax on-reservation cigarette sales to nonmembers "is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status"), *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) (declaring tribal jurisdiction exclusive over lawsuit arising out of on-reservation sales transaction between nonmember plaintiff and member defendants), *Morris v. Hitch-*

---

3. The very purpose of the BIA loan guaranty program is "to encourage eligible borrowers to develop viable Indian businesses through conventional lender financing. The direct function of the Program is to help lenders reduce excessive risks on loans they make. That function in turn helps borrowers secure conventional financing that might otherwise be unavailable." 25 C.F.R. § 103.2.

*cock,* 194 U.S. 384, 24 S.Ct. 712, 48 L.Ed. 1030 (1904) (upholding tribal permit tax on nonmember-owned livestock within boundaries of the Chickasaw Nation), *Buster v. Wright,* 135 F. 947, 950 (8th Cir.1905) (upholding tribe's permit tax on nonmembers for the privilege of conducting business within tribe's borders). *Montana* provides that "the tribe may regulate, through taxation, licensing, or *other means,* the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases, or other arrangements." 450 U.S. at 565–66, 101 S.Ct. 1245 (emphasis added). These cases aptly demonstrate tribal power to regulate through taxation, but they do not directly answer the question of whether tort litigation is part of the "other means" which is mentioned in *Montana.*

■■■ [¶ 24] The bank urges the Court to conclude that tort law does not fall within the rubric of "other means," citing *Ford Motor Co. v. Todecheene,* 394 F.3d 1170 (9th Cir.2005). In *Todecheene,* parents of a tribal member who was killed in a one-vehicle accident on the Navaho Reservation in Arizona filed a product liability action in tribal court against the vehicle manufacturer. The Court of Appeals for the Ninth Circuit held that the existence of a financing agreement between the tribe and the manufacturer did not provide a sufficient basis to subject the vehicle manufacturer to the tribal court's jurisdiction on the basis of consensual relations.[4] Also, the Court of Appeals concluded that the tribe's interest in protecting the lives of its member police officers on tribal roads did not provide a sufficient basis to subject the

manufacturer to the tribal court's jurisdiction under tribal self-government power.

The consensual relations exception recognizes that tribes have jurisdiction to regulate consensual relations "through taxation, licensing, or other means." *Montana,* 450 U.S. at 565, 101 S.Ct. 1245, 67 L.Ed.2d 493. The question here is whether "other means" includes tort law. Tort law does constitute a form of regulation. *See Young v. Anthony's Fish Grottos, Inc.,* 830 F.2d 993, 1000 (9th Cir.1987) (recognizing that the implied covenant tort regulates the employment relationship); *see also Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 337–38 (5th Cir.1995) (state tort law may result in "indirect regulatory impact"). But the Supreme Court in *Strate* appears to have required that the regulation be more directly connected to the contract itself. It would not be illogical to say that Ford agreed to finance the purchase of the Expedition, that the Expedition possibly had a defect, and that the tribe thus has jurisdiction to adjudicate Ford's liability. But one would be hard-pressed to argue convincingly that the product liability action has a direct nexus to the lease itself. It appears somewhat arbitrary to conclude that the Tribe has a greater interest in regulating product defects in vehicles it leases (for which there is a contract between the Tribe and Ford Credit) than in vehicles it purchases for cash (for which there would be no contract with Ford Credit).

*Todecheene,* 394 F.3d at 1180.

[¶ 25] What differs in this case is that the claimed tortious conduct of the bank

---

4. In reaching this conclusion, the Court of Appeals for the Ninth Circuit followed an interpretive maxim which generally instructs that " '[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated

by the preceding specific words.' " *Id.* at 1180, n. 6 (quoting *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 115–115, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001)). "[E]nforcement through the prolonged and uncertain vehicle of litigation is worlds apart from taxation and licensing mechanisms." *Id.*

has a clear nexus with the contractual dealings between the bank and the Long Company. The Court does not read *Todecheene* to completely foreclose the possibility of tribal jurisdiction over tort actions. Rather, *Todecheene* seems to suggest that there must be a connection between the tort and the dealings between the parties. This connection was absent in *Todecheene,* where the parties were tenuously tied through a vehicle lease agreement. Conversely, the discrimination claim raised by the Longs relates exclusively to the manner in which the bank treated the Longs in the various agreements concerning the lease with option to purchase land located wholly within the boundaries of the CRST Reservation. For these reasons, *Todecheene* is inapposite.

[¶ 26] It is also significant that the bank originally sought relief through the assistance of the CRST courts. Recently, the Court of Appeals for the Ninth Circuit considered *Smith v. Salish Kootenai College,* 434 F.3d 1127 (9th Cir.2006), in which a nonmember student at a tribal college brought an action in federal court, alleging that the tribal court lacked jurisdiction over his claims against the tribe. Smith was originally a defendant in the lawsuit, which involved an accident that occurred while he was driving a dump truck owned by the college. Prior to trial, all claims were settled except Smith's cross-claim against the college. Smith litigated his cross-claim in tribal court and a verdict was returned in favor of the college. Following the unfavorable verdict, Smith argued for the first time that the tribal court did not have subject matter jurisdiction. Following a ruling by the district court that the tribal court had jurisdiction, the Court of Appeals considered the *Montana* factors and concluded that the tribal court properly exercised jurisdiction, holding that "a nonmember who knowingly enters tribal courts for the purpose of filing suit against a tribal member has, by the act of filing his claims, entered into a 'consensual relationship' with the tribe within the meaning of *Montana." Id.* at 1140.

[¶ 27] In the instant case, the bank opted to utilize the tribal courts in an attempt to force the Longs off the land. It sent a letter to the CRST tribal court asking that a notice to quit be served upon the Longs. The tribal court accommodated the bank and caused the notice to quit to be served on June 16, 1999. The Longs then filed a complaint in tribal court. In response to the Long Company's action in tribal court, the bank counterclaimed, seeking damages and eviction. It is noteworthy that the bank's position as to the tribal court's subject matter jurisdiction has been somewhat equivocal. In many of its tribal court filings, the bank continued to challenge the jurisdiction of the tribal courts. However, in its motion for summary judgment on its counterclaim in *Long Family Land and Cattle Company Inc. et al. v. Edward and Mary Maciejewski, et al.,* dated September 12, 2002, the bank made various claims, arguing essentially that the lease had expired and the Longs were wrongfully holding over. Appearing in paragraph 2 of that document is the following statement on behalf of the bank:

> The Court has jurisdiction over Long Family Land and Cattle Company, Inc. and Ronnie Long and Lila Long in that the majority ownership of the corporation is owned by Ronnie Long and Lila Long, enrolled members of the Cheyenne River Sioux Tribe and *the Court has jurisdiction over the subject matter of this action.*

Doc. 50, Ex. 10, page 1 (emphasis added).

[¶ 28] This is a significant concession by the bank and the bank should be held to it.

[¶ 29] There is no simple test for determining whether tribal court jurisdiction exists. Questions of jurisdiction over Indians and Indian country remain a " 'com-

plex patchwork of federal, state, and tribal law,' which is better explained by history than by logic." *United States v. Bruce,* 394 F.3d 1215, 1218 (9th Cir.2005) (quoting *Duro v. Reina,* 495 U.S. 676, 680 n. 1, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990)). While the Supreme Court has been reluctant to find civil tribal jurisdiction over defendants who are not members of the tribe, its decisions do not foreclose the possibility, particularly where the defendants enter consensual relationships with tribal members through commercial dealings, contracts, leases, or other arrangements. The tribe properly exercised jurisdiction over *Long Family Land and Cattle Company Inc. et al. v. Edward and Mary Maciejewski, et al,* and there are no genuine issues of material fact remaining for the Court to resolve. The Long Company's motion for summary judgment should be granted in this regard. The bank's motion should be denied.

## II. Due Process

■ [¶ 30] The bank also argues that it was not afforded fundamental due process rights by the CRST Tribal Courts. As such, it urges the Court not to recognize the tribal court judgment. The bank contends that it proceeded through the tribal court proceedings assuming that the Longs' discrimination claim was based upon federal law. It contends that tribal law was never pled or discussed, the case was tried on a federal discrimination theory, the jury instructions were fashioned based on federal law, and the verdict was upheld over its post trial motions based on federal law. It further argues that, because it did not have adequate notice of the tribal law basis of the discrimination claim, it was not afforded a full and fair opportunity to defend itself and be heard on a tribal law claim of discrimination.

[¶ 31] The Longs' amended complaint in tribal court made no reference to 42 U.S.C. or § 1981 or any federal statute.

It generally alleged that "[t]he sale of the Longs' land to the Pesickas and Maciejewskis on terms more favorable than the bank required of the Longs, constitutes unequal treatment and unfair discrimination against the Longs, and prevented the Longs from buying back their land." The Longs, and the CRST, appearing before the Court as *amicus curiae,* urge that the tribal courts applied tribal law.

[¶ 32] An examination of the prior proceedings reveals that the bank is correct that the tribal trial court and appellate court are not in accord on the issue. In addressing the bank's argument that the tribal court lacked jurisdiction to enforce federal anti-discrimination laws, the trial court noted that

> [t]he only anti-discrimination laws explicitly contained in the Cheyenne River Sioux Tribal Code and Constitution are those prohibiting the Tribe from discriminating or denying equal protection of the laws to persons. The Tribe does not appear to have specific code provisions prohibiting private discrimination and the Court is therefore instructed to look to relevant federal law.

Doc. 32, Ex. 22, p. 9.

[¶ 33] Clearly, the CRST trial court considered the Longs' discrimination claim essentially a matter of federal law. It was error for the tribal court to interpret or apply federal law. The CRST submitted an amicus brief in conjunction with the appeal. Perhaps guided by CRST's arguments, the CRST appellate court took a different tack than the trial court, stating that private claims of discrimination are "recognized under the traditional (or common) law of the Cheyenne River Sioux Tribe." Doc. 32, Ex. 24, p. 7. The appellate court treated the Longs' discrimination claim as a tort, and made reference to Cheyenne River Sioux Law and Order Code § 1–4–3, which confers jurisdiction

on the tribal court over claims arising out of tortious conduct. The appellate court reasoned as follows:

> Since it is well understood that a claim based on discrimination essentially sounds in tort, jurisdiction over "tortious conduct" necessarily includes jurisdiction over Plaintiffs' discrimination claim. In addition, there is basis for a discrimination claim that arises directly from Lakota tradition as embedded in Cheyenne River Sioux tradition and custom. Such a potential claim arises from the existence of Lakota customs and norms such as the "traditional Lakota sense of justice, fair play and decency to others." *Miner v. Banley*, Chy. R. Sx. Tr. Ct. App., No. 94–003 A, Mem. Op. And Order at 6 (Feb. 3, 1995); and "the Lakota custom of fairness and respect for individual dignity." *Thompson v. Cheyenne River Sioux Tribal Board of Police Commissioners*, 23 ILR 6045, 6048 Chey. R. Sx. Tr. Ct.App. (1996). Such notions of fair play are core ingredients in federal and state definitions of discrimination. Therefore a tribally based cause of action grounded in an assertion of discrimination may proceed as a "tort" claim as defined in the Cheyenne River Sioux Tribal Code, as derived from Tribal tradition and custom, or even from the federal ingredients defined at 42 U.S.C. § 2000–2001.

Doc. 32, Ex. 24, p. 8.

[¶ 34] The Court of Appeals for the Eighth Circuit has noted that it reviews judgments, not opinions, and "may affirm on any ground supported by the record, whether or not that ground was urged below or passed on by the district court." *Gralike v. Cook*, 191 F.3d 911, 921 n. 9 (8th Cir.1999). The Court has no reason to believe the law is otherwise in tribal courts, and the bank does not claim that it is.

[¶ 35] The bank had opportunities throughout the litigation to challenge the source of law for the Longs' discrimination claim. It could have filed a motion to dismiss based upon the vagueness of the Longs' discrimination claim in the amended complaint. It made no such challenge. The factual record at the trial level was fully developed vis-a-vis the claimed discrimination. The gravamen of the bank's appeal was centered on the source of law for the discrimination claim and the CRST appellate court decided the issue, albeit differently than the CRST trial court. It requires no citation of authority to state that an appellate court may find that a lower court reached the correct result, albeit for the wrong reason. The bank's motion for summary judgment should be denied.

[¶ 36] Now, therefore,

[¶ 37] IT IS ORDERED:

(1) The Longs' motion for summary judgment (Doc. 33) is granted. The Cheyenne River Sioux Tribal Court properly exercised jurisdiction over *Long Family Land and Cattle Company Inc. et al. v. Edward and Mary Maciejewski, et al.*

(2) The bank's motion for summary judgment (Doc. 28) is denied.

(3) No costs will be taxed.