(Slip Opinion) OCTOBER TERM, 2007 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PLAINS COMMERCE BANK *v.* LONG FAMILY LAND & CATTLE CO., INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 07–411. Argued April 14, 2008—Decided June 25, 2008

Petitioner Plains Commerce Bank (Bank), a non-Indian bank, sold land it owned in fee simple on a tribal reservation to non-Indians. Respondents the Longs, an Indian couple who had been leasing the land with an option to purchase, claim the Bank discriminated against them by selling the parcel to nonmembers of the Tribe on terms more favorable than the Bank offered to sell it to them. The couple sued in Tribal Court, asserting, *inter alia*, discrimination, breach-of-contract, and bad-faith claims. Over the Bank's objection, the Tribal Court concluded that it had jurisdiction and proceeded to trial, where a jury ruled against the Bank on three claims, including the discrimination claim. The court awarded the Longs damages plus interest. In a supplemental judgment, the court also gave the Longs an option to purchase that portion of the fee land they still occupied, nullifying the Bank's sale of the land to non-Indians. After the Tribal Court of Appeals affirmed, the Bank filed suit in Federal District Court, contending that the tribal judgment was null and void because, as relevant here, the Tribal Court lacked jurisdiction over the Longs' discrimination claim. The District Court granted the Longs summary judgment, finding tribal court jurisdiction proper because the Bank's consensual relationship with the Longs and their company (also a respondent here) brought the Bank within the first category of tribal civil jurisdiction over nonmembers outlined in *Montana* v. *United States*, 450 U. S. 544. The Eighth Circuit affirmed, concluding that the Tribe had authority to regulate the business conduct of persons voluntarily dealing with tribal members, including a nonmember's sale of fee land.

*Held:*

1. The Bank has Article III standing to pursue this challenge. Both with respect to damages and the option to purchase, the Bank was "injured in fact," see *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560, by the Tribal Court's exercise of jurisdiction over the discrimination claim. This Court is unpersuaded by the Longs' claim that the damages award was premised entirely on their breach-of-contract verdict, which the Bank has not challenged, rather than on their discrimination claim. Because the verdict form allowed the jury to make a damages award after finding liability as to *any* of the individual claims, the jury could have based its damages award, in whole or in part, on the discrimination finding. The Bank was also injured by the option to purchase. Only the Longs' discrimination claim sought deed to the land as relief. The fact that the remedial purchase option applied only to a portion of the total parcel does not eliminate the injury to the Bank, which had no obligation to sell any of the land to the Longs before the Tribal Court's judgment. That judgment effectively nullified a portion of the sale to a third party. These injuries can be remedied by a ruling that the Tribal Court lacked jurisdiction and that its judgment on the discrimination claim is null and void. Pp. 5–8.

2. The Tribal Court did not have jurisdiction to adjudicate a discrimination claim concerning the non-Indian Bank's sale of its fee land. Pp. 8–24.

(a) The general rule that tribes do not possess authority over non-Indians who come within their borders, *Montana* v. *United States*, 450 U. S. 564, 565, restricts tribal authority over nonmember activities taking place on the reservation, and is particularly strong when the nonmember's activity occurs on land owned in fee simple by non-Indians, *Strate* v. *A-1 Contractors*, 520 U. S. 438, 446. Once tribal land is converted into fee simple, the tribe loses plenary jurisdiction over it. See *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251, 267–268. Moreover, when the tribe or its members convey fee land to third parties, the tribe "loses any former right of absolute and exclusive use and occupation of the conveyed lands." *South Dakota* v. *Bourland*, 508 U. S. 679, 689. Thus, "the tribe has no authority itself . . . to regulate the use of fee land." *Brendale* v. *Confederated Tribes and Bands of Yakima Nation,* 492 U. S. 408, 430. *Montana* provides two exceptions under which tribes may exercise "civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands," 450 U. S., at 565: (1) "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts,

leases, or other arrangements," *ibid.;* and (2) a tribe may exercise "civil authority over the conduct of non-Indians on fee lands within the reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe," *id.*, at 566. Neither exception authorizes tribal courts to exercise jurisdiction over the Longs' discrimination claim. Pp. 8–11.

(b) The Tribal Court lacks jurisdiction to hear that claim because the Tribe lacks the civil authority to regulate the Bank's sale of its fee land, and "a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction," *Strate, supra*, at 453. *Montana* does not permit tribes to regulate the sale of non-Indian fee land. Rather, it permits tribal regulation of nonmember *conduct* inside the reservation that implicates the tribe's sovereign interests. 450 U. S., at 564–565. With only one exception, see *Brendale, supra,* this Court has never "upheld under *Montana* the extension of tribal civil authority over nonmembers on non-Indian land," *Nevada* v. *Hicks*, 533 U. S. 353, 360. Nor has the Court found that *Montana* authorized a tribe to regulate the sale of such land. This makes good sense, given the limited nature of tribal sovereignty and the liberty interests of nonmembers. Tribal sovereign interests are confined to managing tribal land, see *Worcester* v. *Georgia*, 6 Pet. 515, 561, protecting tribal self-government, and controlling internal relations, see *Montana, supra,* at 564. Regulations approved under *Montana* all flow from these limited interests. See, *e.g., Duro* v. *Reina*, 495 U. S. 676, 696. None of these interests justified tribal regulation of a nonmember's sale of fee land. The Tribe cannot justify regulation of the sale of non-Indian fee land by reference to its power to superintend tribal land because non-Indian fee parcels have ceased to be tribal land. Nor can regulation of fee land sales be justified by the Tribe's interest in protecting internal relations and self-government. Any direct harm sustained because of a fee land sale is sustained at the point the land passes from Indian to non-Indian hands. Resale, by itself, causes no additional damage. Regulating fee land sales also runs the risk of subjecting nonmembers to tribal regulatory authority without their consent. Because the Bill of Rights does not apply to tribes and because nonmembers have no say in the laws and regulations governing tribal territory, tribal laws and regulations may be applied only to nonmembers who have consented to tribal authority, expressly or by action. Even then the regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve self-government, or control internal relations. There is no reason the Bank should have anticipated that its general business dealings with the Longs would permit the Tribe to regulate the Bank's sale of land

it owned in fee simple. The Longs' attempt to salvage their position by arguing that the discrimination claim should be read to challenge the Bank's whole course of commercial dealings with them is unavailing. Their breach-of-contract and bad-faith claims involve the Bank's general dealings; the discrimination claim does not. The discrimination claim is tied specifically to the fee land sale. And only the discrimination claim is before the Court. Pp. 11–22.

(c) Because the second *Montana* exception stems from the same sovereign interests giving rise to the first, it is also inapplicable here. The "conduct" covered by that exception must do more than injure a tribe; it must "imperil the subsistence" of the tribal community. *Montana*, 450 U. S., at 566. The land at issue has been owned by a non-Indian party for at least 50 years. Its resale to another non-Indian hardly "imperil[s] the subsistence or welfare of the tribe." *Ibid.* Pp. 22–23.

(d) Contrary to the Longs' argument, when the Bank sought the Tribal Court's aid in serving process on the Longs for the Bank's pending state-court eviction action, the Bank did not consent to tribal court jurisdiction over the discrimination claim. The Bank has consistently contended that the Tribal Court lacked jurisdiction. P. 23.

491 F. 3d 878, reversed.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined, and in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined as to Part II. GINSBURG, J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part, in which STEVENS, SOUTER, and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–411

PLAINS COMMERCE BANK, PETITIONER *v.* LONG
FAMILY LAND AND CATTLE COMPANY,
INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[June 25, 2008]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

This case concerns the sale of fee land on a tribal reservation by a non-Indian bank to non-Indian individuals. Following the sale, an Indian couple, customers of the bank who had defaulted on their loans, claimed the bank discriminated against them by offering the land to non-Indians on terms more favorable than those the bank offered to them. The couple sued on that claim in tribal court; the bank contested the court's jurisdiction. The tribal court concluded that it had jurisdiction and proceeded to hear the case. It ultimately ruled against the bank and awarded the Indian couple damages and the right to purchase a portion of the fee land. The question presented is whether the tribal court had jurisdiction to adjudicate a discrimination claim concerning the non-Indian bank's sale of fee land it owned. We hold that it did not.

I

The Long Family Land and Cattle Company, Inc. (Long

Company or Company), is a family-run ranching and
farming operation incorporated under the laws of South
Dakota.   Its lands are located on the Cheyenne River
Sioux Indian Reservation.   Once a massive, 60-million
acre affair, the reservation was appreciably diminished by
Congress in the 1880s and at present consists of roughly
11 million acres located in Dewey and Ziebach Counties in
north-central South Dakota.   The Long Company is a
respondent here, along with Ronnie and Lila Long, hus-
band and wife, who together own at least 51 percent of the
Company's shares.   Ronnie and Lila Long are both en-
rolled members of the Cheyenne River Sioux Indian Tribe.

   The Longs and their Company have been customers for
many years at Plains Commerce Bank (Bank), located
some 25 miles off the reservation as the crow flies in Ho-
ven, South Dakota.   The Bank, like the Long Company, is
a South Dakota corporation, but has no ties to the reserva-
tion other than its business dealings with tribal members.
The Bank made its first commercial loan to the Long
Company in 1989, and a series of agreements followed.   As
part of those agreements, Kenneth Long—Ronnie Long's
father and a non-Indian—mortgaged to the Bank 2,230
acres of fee land he owned inside the reservation.   At the
time of Kenneth Long's death in the summer of 1995,
Kenneth and the Long Company owed the Bank $750,000.

   In the spring of 1996, Ronnie and Lila Long began
negotiating a new loan contract with the Bank in an effort
to shore up their Company's flagging financial fortunes
and come to terms with their outstanding debts.   After
several months of back-and-forth, the parties finally
reached an agreement in December of that year—two
agreements, to be precise.   The Company and the Bank
signed a fresh loan contract, according to which Kenneth
Long's estate deeded over the previously mortgaged fee
acreage to the Bank in lieu of foreclosure.   App. 104.   In
return, the Bank agreed to cancel some of the Company's

debt and to make additional operating loans. The parties also agreed to a lease arrangement: The Company received a two-year lease on the 2,230 acres, deeded over to the Bank, with an option to purchase the land at the end of the term for $468,000. *Id.*, at 96–103.

It is at this point, the Longs claim, that the Bank began treating them badly. The Longs say the Bank initially offered more favorable purchase terms in the lease agreement, allegedly proposing to sell the land back to the Longs with a 20-year contract for deed. The Bank eventually rescinded that offer, the Longs claim, citing "'possible jurisdictional problems'" that might have been caused by the Bank financing an "'Indian owned entity on the reservation.'" 491 F. 3d 878, 882 (CA8 2007) (case below).

Then came the punishing winter of 1996–1997. The Longs lost over 500 head of cattle in the blizzards that season, with the result that the Long Company was unable to exercise its option to purchase the leased acreage when the lease contract expired in 1998. Nevertheless, the Longs refused to vacate the property, prompting the Bank to initiate eviction proceedings in state court and to petition the Cheyenne River Sioux Tribal Court to serve the Longs with a notice to quit. In the meantime, the Bank sold 320 acres of the fee land it owned to a non-Indian couple. In June 1999, while the Longs continued to occupy a 960-acre parcel of the land, the Bank sold the remaining 1,910 acres to two other nonmembers.

In July 1999, the Longs and the Long Company filed suit against the Bank in the Tribal Court, seeking an injunction to prevent their eviction from the property and to reverse the sale of the land. They asserted a variety of claims, including breach of contract, bad faith, violation of tribal-law self-help remedies, and discrimination. The discrimination claim alleged that the Bank sold the land to nonmembers on terms more favorable than those offered the Company. The Bank asserted in its answer that

the court lacked jurisdiction and also stated a counter-
claim. The Tribal Court found that it had jurisdiction,
denied the Bank's motion for summary judgment on its
counterclaim, and proceeded to trial. Four causes of ac-
tion were submitted to the seven-member jury: breach of
contract, bad faith, violation of self-help remedies, and
discrimination.

The jury found for the Longs on three of the four causes,
including the discrimination claim, and awarded a
$750,000 general verdict. After denying the Bank's post-
trial motion for judgment notwithstanding the verdict by
finding again that it had jurisdiction to adjudicate the
Longs' claims, the Tribal Court entered judgment award-
ing the Longs $750,000 plus interest. A later supplemen-
tal judgment further awarded the Longs an option to
purchase the 960 acres of the land they still occupied on
the terms offered in the original purchase option, effec-
tively nullifying the Bank's previous sale of that land to
non-Indians.

The Bank appealed to the Cheyenne River Sioux Tribal
Court of Appeals, which affirmed the judgment of the trial
court. The Bank then filed the instant action in the
United States District Court for the District of South
Dakota, seeking a declaration that the tribal judgment
was null and void because, as relevant here, the Tribal
Court lacked jurisdiction over the Longs' discrimination
claim. The District Court granted summary judgment to
the Longs. The court found tribal court jurisdiction proper
because the Bank had entered into a consensual relation-
ship with the Longs and the Long Company. 440 F. Supp.
2d 1070, 1077–1078, 1080–1081 (SD 2006). According to
the District Court, this relationship brought the Bank
within the first category of tribal civil jurisdiction over
nonmembers outlined in *Montana* v. *United States*, 450
U. S. 544 (1981). See 440 F. Supp. 2d, at 1077–1078.

The Court of Appeals for the Eighth Circuit affirmed.

491 F. 3d 878. The Longs' discrimination claim, the court held, "arose directly from their preexisting commercial relationship with the bank." *Id.*, at 887. When the Bank chose to deal with the Longs, it effectively consented to substantive regulation by the tribe: An antidiscrimination tort claim was just another way of regulating the commercial transactions between the parties. See *ibid.* In sum, the Tribe had authority to regulate the business conduct of persons who "voluntarily deal with tribal members," including, here, a nonmember's sale of fee land. *Ibid.*

We granted certiorari, 552 U. S. \_\_\_ (2008), and now reverse.

## II

Before considering the Tribal Court's authority to adjudicate the discrimination claim, we must first address the Longs' contention that the Bank lacks standing to raise this jurisdictional challenge in the first place. Though the Longs raised their standing argument for the first time before this Court, we bear an independent obligation to assure ourselves that jurisdiction is proper before proceeding to the merits. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 94–95 (1998).

We begin by noting that whether a tribal court has adjudicative authority over nonmembers is a federal question. See *Iowa Mut. Ins. Co.* v. *LaPlante*, 480 U. S. 9, 15 (1987); *National Farmers Union Ins. Cos.* v. *Crow Tribe*, 471 U. S. 845, 852–853 (1985). If the tribal court is found to lack such jurisdiction, any judgment as to the nonmember is necessarily null and void. The Longs do not contest this settled principle but argue instead that the Bank has suffered no "injury in fact" as required by Article III's case-or-controversy provision. See *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992).

The Longs appear to recognize their argument is somewhat counterintuitive. They concede the jury found the

Bank guilty of discrimination and awarded them $750,000 plus interest. But the Longs contend the jury's damages award was in fact premised entirely on their breach-of-contract rather than on their discrimination claim. The Bank does not presently challenge the breach-of-contract verdict.

In support of their argument, the Longs point to their amended complaint in the Tribal Court. The complaint comprised nine counts. Several of the counts sought damages; the discrimination count did not. As relief for the discrimination claim, the Longs asked to be granted "possession and title to their land." App. 173. The Longs contend that the damage award therefore had nothing to do with the discrimination claim. As a result, a decision from this Court finding no jurisdiction with respect to that claim—the only claim the Bank appeals—would not change anything.

We are not persuaded. The jury verdict form consisted of six special interrogatories, covering each claim asserted against the Bank, with another one covering the amount of damages to be awarded. *Id.,* at 190–192. The damages interrogatory specifically allowed the jury to make an award after finding liability as to *any* of the individual claims: "If you answered yes to Numbers 1, 3, 4, *or* 5 what amount of damages should be awarded to the Plaintiffs?" *Id.*, at 192 (emphasis added). The jury found against the Bank on three of the special interrogatories, including number 4, the discrimination claim. The Bank, the jurors found, "intentionally discriminate[d] against the Plaintiffs Ronnie and Lila Long." *Id.*, at 191. The jury then entered an award of $750,000. *Id.*, at 192. These facts establish that the jury could have based its damages award, in whole or in part, on the finding of discrimination.

There is, in addition, the option to purchase. The Longs argue that requiring the Bank to void the sale to non-members of a 960–acre parcel and sell that parcel to them

instead does not constitute injury-in-fact, because the Tribal Court actually *denied* the relief the Longs sought for the Bank's discrimination. In its supplemental judgment, the Tribal Court refused to permit the Longs (or the Long Company) to purchase all the land—as they had requested—instead granting an option to purchase only the 960 acres the Longs occupied at the time. See Supplemental Judgment in No. R–120–99, *Long Family Land & Cattle Co.* v. *Maciejewski,* (Feb. 18, 2003), App. to Pet. for Cert. A–69 to A–70. Even this partial relief, the Longs insist, was crafted as an equitable remedy for their breach-of-contract claim, see Brief for Respondents 32–34, and in any event the Bank really suffered no harm, because it would gain as much income selling to the Longs as it did selling to the nonmembers, see *id.*, at 34–35.

These arguments do not defeat the Bank's standing. The Longs requested, as a remedy for the alleged discrimination, "possession and title" to the subject land. App. 173. They received an option to acquire a portion of exactly that. See App. to Pet. for Cert. A–69 to A–70. The Tribal Court's silence in its supplemental judgment as to which claim, exactly, the option to purchase was meant to remedy is immaterial. See *ibid.* Of the four claims presented to the jury, only the discrimination claim sought deed to the land as relief. See Amended Complaint (Jan. 3, 2000), App. 158, 173. Nor does the fact that the remedial purchase option applied only to a portion of the total parcel eliminate the Bank's injury. The Bank had no obligation to sell the land to the Longs before the Tribal Court's judgment—indeed, the Bank had already sold the acreage to third parties. The Tribal Court judgment effectively nullified a portion of that sale. This judicially imposed burden certainly qualifies as an injury for standing purposes. As for the Longs' speculation that the Bank would make as much money selling the land to them as it did selling the parcel to nonmembers, the argument is

entirely beside the point. There is more than adequate injury in being compelled to undo one deed and enter into another—particularly with individuals who had previously defaulted on loans.

Both with respect to damages and the option to purchase, the Bank was injured by the Tribal Court's exercise of jurisdiction over the discrimination claim. Those injuries can be remedied by a ruling in favor of the Bank that the Tribal Court lacked jurisdiction and that its judgment on the discrimination claim is null and void. The ultimate collateral consequence of such a determination, whatever it may be—vacatur of the general damages award, vacatur of the option to purchase, a new trial on the other claims— does not alter the fact that the Bank has shown injury traceable to the challenged action and likely to be redressed by a favorable ruling. *Allen* v. *Wright*, 468 U. S. 737, 751 (1984). The Bank has Article III standing to pursue this challenge.

## III

### A

For nearly two centuries now, we have recognized Indian tribes as "distinct, independent political communities," *Worcester* v. *Georgia*, 6 Pet. 515, 559 (1832), qualified to exercise many of the powers and prerogatives of self-government, see *United States* v. *Wheeler*, 435 U. S. 313, 322–323 (1978). We have frequently noted, however, that the "sovereignty that the Indian tribes retain is of a unique and limited character." *Id.*, at 323. It centers on the land held by the tribe and on tribal members within the reservation. See *United States* v. *Mazurie*, 419 U. S. 544, 557 (1975) (tribes retain authority to govern "both their members and their territory," subject ultimately to Congress); see also *Nevada* v. *Hicks*, 533 U. S. 353, 392 (2001) ("[T]ribes retain sovereign interests in activities that occur on land owned and controlled by the tribe")

(O'Connor, J., concurring in part and concurring in judgment).

As part of their residual sovereignty, tribes retain power to legislate and to tax activities on the reservation, including certain activities by nonmembers, see *Kerr-McGee Corp.* v. *Navajo Tribe*, 471 U. S. 195, 201 (1985), to determine tribal membership, see *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 55 (1978), and to regulate domestic relations among members, see *Fisher* v. *District Court of Sixteenth Judicial Dist. of Mont.,* 424 U. S. 382, 387–389 (1976) *(per curiam).* They may also exclude outsiders from entering tribal land. See *Duro* v. *Reina*, 495 U. S. 676, 696–697 (1990). But tribes do not, as a general matter, possess authority over non-Indians who come within their borders: "[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana*, at 450 U. S., at 565. As we explained in *Oliphant* v. *Suquamish Tribe*, 435 U. S. 191 (1978), the tribes have, by virtue of their incorporation into the American republic, lost "the right of governing . . . person[s] within their limits except themselves." *Id.*, at 209 (emphasis and internal quotation marks omitted).

This general rule restricts tribal authority over nonmember activities taking place on the reservation, and is particularly strong when the nonmember's activity occurs on land owned in fee simple by non-Indians—what we have called "non-Indian fee land." *Strate* v. *A–1 Contractors*, 520 U. S. 438, 446 (1997) (internal quotation marks omitted). Thanks to the Indian General Allotment Act of 1887, 24 Stat. 388, as amended, 25 U. S. C. §331 *et seq.,* there are millions of acres of non-Indian fee land located within the contiguous borders of Indian tribes. See *Atkinson Trading Co.* v. *Shirley*, 532 U. S. 645, 648, 651, n. 1 (2001). The history of the General Allotment Act and its successor statutes has been well rehearsed in our precedents. See, *e.g., Montana, supra*, at 558–563; *County of*

*Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251, 254–255 (1992). Suffice it to say here that the effect of the Act was to convert millions of acres of formerly tribal land into fee simple parcels, "fully alienable," *id.,* at 264, and "free of all charge or encumbrance whatsoever," 25 U. S. C. §348 (2000 ed., Supp. V). See F. Cohen, Handbook of Federal Indian Law §16.03[2][b], pp. 1041–1042 (2005 ed.) (hereinafter Cohen).

Our cases have made clear that once tribal land is converted into fee simple, the tribe loses plenary jurisdiction over it. See *County of Yakima, supra*, at 267–268 (General Allotment Act permits Yakima County to impose ad valorem tax on fee land located within the reservation); *Goudy* v. *Meath*, 203 U. S. 146, 140–150 (1906) (by rendering allotted lands alienable, General Allotment Act exposed them to state assessment and forced sale for taxes); *In re Heff*, 197 U. S. 488, 502–503 (1905) (fee land subject to plenary state jurisdiction upon issuance of trust patent (superseded by the Burke Act, 34 Stat. 182, 25 U. S. C. §349) (2000 ed.)). Among the powers lost is the authority to prevent the land's sale, see *County of Yakima, supra*, at 263 (General Allotment Act granted fee holders power of voluntary sale)—not surprisingly, as "free alienability" by the holder is a core attribute of the fee simple, C. Moynihan, Introduction to Law of Real Property §3, p. 32 (2d ed. 1988). Moreover, when the tribe or tribal members convey a parcel of fee land "*to non-Indians*, [the tribe] loses any former right of absolute and exclusive use and occupation of the conveyed lands." *South Dakota* v. *Bourland*, 508 U. S. 679, 689 (1993) (emphasis added). This necessarily entails the "the loss of regulatory jurisdiction over the use of the land by others." *Ibid.* As a general rule, then, "the tribe has no authority itself, by way of tribal ordinance or actions in the tribal courts, to regulate the use of fee land." *Brendale* v. *Confederated Tribes and Bands of Yakima Nation*, 492 U. S. 408, 430 (1989) (opinion of White, J.).

We have recognized two exceptions to this principle, circumstances in which tribes may exercise "civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." *Montana*, 450 U. S., at 565. First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Ibid.* Second, a tribe may exercise "civil authority over the conduct of non-Indians on fee lands within the reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.*, at 566. These rules have become known as the *Montana* exceptions, after the case that elaborated them. By their terms, the exceptions concern regulation of "the *activities* of nonmembers" or "the *conduct* of non-Indians on fee land."

Given *Montana*'s "'general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe,'" *Atkinson, supra*, at 651 (quoting *Montana*, *supra*, at 565), efforts by a tribe to regulate nonmembers, especially on non-Indian fee land, are "presumptively invalid," *Atkinson, supra,* at 659. The burden rests on the tribe to establish one of the exceptions to *Montana*'s general rule that would allow an extension of tribal authority to regulate nonmembers on non-Indian fee land. *Atkinson,* 532 U. S., at 654. These exceptions are "limited" ones, *id.*, at 647, and cannot be construed in a manner that would "swallow the rule," *id.*, at 655, or "severely shrink" it, *Strate*, 520 U. S., at 458. The Bank contends that neither exception authorizes tribal courts to exercise jurisdiction over the Longs' discrimination claim at issue in this case. We agree.

B

According to our precedents, "a tribe's adjudicative

jurisdiction does not exceed its legislative jurisdiction."
*Id.*, at 453. We reaffirm that principle today and hold that
the Tribal Court lacks jurisdiction to hear the Longs'
discrimination claim because the Tribe lacks the civil
authority to regulate the Bank's sale of its fee land.

The Longs' discrimination claim challenges a non-
Indian's sale of non-Indian fee land. Despite the Longs'
attempt to recharacterize their claim as turning on the
Bank's alleged "failure to pay to respondents loans prom-
ised for cattle-raising on tribal trust land," Brief for Re-
spondents 47, in fact the Longs brought their discrimina-
tion claim "seeking to have the land sales set aside on the
ground that the sale to nonmembers 'on terms more favor-
able' than the bank had extended to the Longs" violated
tribal tort law, 491 F. 3d, at 882 (quoting Plaintiffs'
Amended Complaint, App. 173). See also Brief for United
States as *Amicus Curiae* 7. That discrimination claim
thus concerned the sale of a 2,230-acre fee parcel that the
Bank had acquired from the estate of a non-Indian.

The status of the land is relevant "insofar as it bears on
the application of . . . *Montana*'s exceptions to [this] case."
*Hicks*, 533 U. S., at 376 (SOUTER, J., concurring). The
acres at issue here were alienated from the Cheyenne
River Sioux's tribal trust and converted into fee simple
parcels as part of the Act of May 27, 1908, 35 Stat. 312,
commonly called the 1908 Allotment Act. See Brief for
Respondents 4, n. 2. While the General Allotment Act
provided for the division of tribal land into fee simple
parcels owned by individual tribal members, that Act also
mandated that such allotments would be held in trust for
their owners by the United States for a period of 25
years—or longer, at the President's discretion—during
which time the parcel owners had no authority to sell or
convey the land. See 25 U. S. C. §348 (2000 ed., and Supp.
V). The 1908 Act released particular Indian owners from
these restrictions ahead of schedule, vesting in them full

fee ownership. See §1, 35 Stat. 312. In 1934, Congress passed the Indian Reorganization Act, 48 Stat. 984, 25 U. S. C. §461 *et seq.,* which "pu[t] an end to further allotment of reservation land," but did not "return allotted land to pre-General Allotment status, leaving it fully alienable by the allottees, their heirs, and assigns." *County of Yakima*, 502 U. S., at 264.

The tribal tort law the Longs are attempting to enforce, however, operates as a restraint on alienation. It "set[s] limits on how nonmembers may engage in commercial transactions," 491 F. 3d, at 887—and not just any transactions, but specifically nonmembers' sale of fee lands they own. It regulates the substantive terms on which the Bank is able to offer its fee land for sale. Respondents and their principal *amicus*, the United States, acknowledge that the tribal tort at issue here is a form of regulation. See Brief for Respondents 52; Brief for United States as *Amicus Curiae* 25–26; see also *Riegel* v. *Medtronic, Inc.*, 552 U. S. \_\_\_, \_\_\_ (2008) (slip op., at 11). They argue the regulation is fully authorized by the first *Montana* exception. They are mistaken.

*Montana* does not permit Indian tribes to regulate the sale of non-Indian fee land. *Montana* and its progeny permit tribal regulation of nonmember *conduct* inside the reservation that implicates the tribe's sovereign interests. *Montana* expressly limits its first exception to the "activities of nonmembers," 450 U. S., at 565, allowing these to be regulated to the extent necessary "to protect tribal self-government [and] to control internal relations," *id.*, at 564. See *Big Horn Cty. Elect. Cooperative, Inc.* v. *Adams*, 219 F. 3d 944, 951 (CA9 2000) ("*Montana* does not grant a tribe unlimited regulatory or adjudicative authority over a nonmember. Rather, *Montana* limits tribal jurisdiction under the first exception to the regulation of the *activities* of nonmembers" (internal quotations omitted; emphasis added)).

We cited four cases in explanation of *Montana*'s first exception. Each involved regulation of non-Indian activities on the reservation that had a discernable effect on the tribe or its members. The first concerned a tribal court's jurisdiction over a contract dispute arising from the sale of merchandise by a non-Indian to an Indian on the reservation. See *Williams* v. *Lee*, 358 U. S. 217 (1959). The other three involved taxes on economic activity by nonmembers. See *Washington* v. *Confederated Tribes of Colville Reservation*, 447 U. S. 134, 152–153 (1980) (in cases where "the tribe has a significant interest in the subject matter," tribes retain "authority to tax the activities or property of non-Indians taking place or situated on Indian lands"); *Morris* v. *Hitchcock*, 194 U. S. 384, 393 (1904) (upholding tribal taxes on nonmembers grazing cattle on Indian-owned fee land within tribal territory); *Buster* v. *Wright*, 135 F. 947, 950 (CA8 1905) (Creek Nation possessed power to levy a permit tax on nonmembers for the privilege of doing business within the reservation).

Our cases since *Montana* have followed the same pattern, permitting regulation of certain forms of nonmember conduct on tribal land. We have upheld as within the tribe's sovereign authority the imposition of a severance tax on natural resources removed by nonmembers from tribal land. See *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130 (1982). We have approved tribal taxes imposed on leasehold interests held in tribal lands, as well as sales taxes imposed on nonmember businesses within the reservation. See *Kerr-McGee*, 471 U. S., at 196–197. We have similarly approved licensing requirements for hunting and fishing on tribal land. See *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324, 337 (1983).

Tellingly, with only "one minor exception, we have never upheld under *Montana* the extension of tribal civil authority over nonmembers *on non-Indian land*." *Hicks*, *supra*, at 360 (emphasis added). See *Atkinson*, 532 U. S., at 659

(Tribe may not tax nonmember activity on non-Indian fee land); *Strate*, 520 U. S., at 454, 457 (tribal court lacks jurisdiction over tort suit involving an accident on non-tribal land); *Montana*, *supra*, at 566 (Tribe has no authority to regulate nonmember hunting and fishing on non-Indian fee land). The exception is *Brendale* v. *Confederated Tribes and Bands of Yakima Nation*, 492 U. S. 408, and even it fits the general rubric noted above: In that case, we permitted a tribe to restrain particular *uses* of non-Indian fee land through zoning regulations. While a six-Justice majority held that *Montana* did *not* authorize the Yakima Nation to impose zoning regulations on non-Indian fee land located in an area of the reservation where nearly half the acreage was owned by nonmembers, 492 U. S., at 430–431 (opinion of White, J.); *id.*, at 444–447 (opinion of STEVENS, J.), five Justices concluded that *Montana* did permit the Tribe to impose different zoning restrictions on nonmember fee land isolated in "the heart of [a] closed portion of the reservation," 492 U. S., at 440 (opinion of STEVENS, J.), though the Court could not agree on a rationale, see *id.*, at 443–444 (same); *id.,* at 458–459 (opinion of Blackmun, J.).

But again, whether or not we have permitted regulation of nonmember activity on non-Indian fee land in a given case, in no case have we found that *Montana* authorized a tribe to regulate the sale of such land. Rather, our *Montana* cases have always concerned nonmember conduct on the land. See, *e.g., Hicks,* 533 U. S., at 359 (*Montana* and *Strate* concern "tribal authority to regulate nonmembers' *activities* on [fee] land" (emphasis added)); *Atkinson*, 532 U. S., at 647 ("conduct of nonmembers on non-Indian fee land"); *id.*, at 660 (SOUTER, J., concurring) ("the activities of nonmembers); *Bourland*, 508 U. S., at 689 ("use of the land"); *Brendale*, *supra*, at 430 ("use of fee land"); *Montana*, *supra*, at 565 (first exception covers "activities of

nonmembers").[1]

The distinction between sale of the land and conduct on it is well-established in our precedent, as the foregoing cases demonstrate, and entirely logical given the limited nature of tribal sovereignty and the liberty interests of nonmembers. By virtue of their incorporation into the United States, the tribe's sovereign interests are now confined to managing tribal land, see *Worcester*, 6 Pet., at 561 (persons are allowed to enter Indian land only "with the assent of the [tribal members] themselves"), "protect[ing] tribal self-government," and "control[ling] internal relations," see *Montana*, *supra*, at 564. The logic of *Montana* is that certain activities on non-Indian fee land (say, a business enterprise employing tribal members) or certain uses (say, commercial development) may intrude on the internal relations of the tribe or threaten tribal self-rule. To the extent they do, such activities or land uses may be regulated. See *Hicks*, *supra*, at 361 ("Tribal assertion of regulatory authority over nonmembers must be connected to that right of the Indians to make their own laws and be governed by them"). Put another way, certain forms of nonmember behavior, even on non-Indian fee land, may sufficiently affect the tribe as to justify tribal oversight. While tribes generally have no interest in regulating the conduct of nonmembers, then, they may regulate nonmember behavior that implicates tribal governance and internal relations.

The regulations we have approved under *Montana* all flow directly from these limited sovereign interests. The

---

[1] JUSTICE GINSBURG questions this distinction between sales and activities on the ground that "[s]ales of land—and related conduct—are surely 'activities' within the ordinary sense of the word." *Post*, at 6. We think the distinction is readily understandable. In any event, the question is not whether a sale is, in some generic sense, an action. The question is whether land ownership and sale are "activities" within the meaning of *Montana* and the other cited precedents.

tribe's "traditional and undisputed power to exclude persons" from tribal land, *Duro*, 495 U. S., at 696, for example, gives it the power to set conditions on entry to that land via licensing requirements and hunting regulations. See *Bourland*, *supra*, at 691, n. 11 ("Regulatory authority goes hand in hand with the power to exclude"). Much taxation can be justified on a similar basis. See *Colville*, 447 U. S., at 153 (taxing power "may be exercised over . . . nonmembers, so far as such nonmembers may accept privileges of trade, residence, etc., to which taxes may be attached as *conditions*" (quoting *Powers of Indian Tribes*, 55 I. D. 14, 46 (1934; emphasis added). The power to tax certain nonmember activity can also be justified as "a necessary instrument of self-government and territorial management," *Merrion*, 455 U. S., at 137, insofar as taxation "enables a tribal government to raise revenues for its essential services," to pay its employees, to provide police protection, and in general to carry out the functions that keep peace and order, *ibid.*

JUSTICE GINSBURG wonders why these sorts of regulations are permissible under *Montana* but regulating the sale of fee land is not. See *post*, at 6–7. The reason is that regulation of the sale of non-Indian fee land, unlike the above, cannot be justified by reference to the tribe's sovereign interests. By definition, fee land owned by nonmembers has already been removed from the tribe's immediate control. See *Strate*, 520 U. S., at 456 (tribes lack power to "assert [over non-Indian fee land] a landowner's right to occupy and exclude"). It has already been alienated from the tribal trust. The tribe cannot justify regulation of such land's sale by reference to its power to superintend tribal land, then, because non-Indian fee parcels have ceased to *be* tribal land.

Nor can regulation of fee land sales be justified by the tribe's interests in protecting internal relations and self-government. Any direct harm to its political integrity that

the tribe sustains as a result of fee land sale is sustained at the point the land passes from Indian to non-Indian hands. It is at that point the tribe and its members lose the ability to use the land for their purposes. Once the land has been sold in fee simple to non-Indians and passed beyond the tribe's immediate control, the mere resale of that land works no additional intrusion on tribal relations or self-government. Resale, by itself, causes no additional damage.

This is not to suggest that the sale of the land will have no impact on the tribe. The *uses* to which the land is put may very well change from owner to owner, and those uses may well affect the tribe and its members. As our cases bear out, see *supra*, at 14–16, the tribe may quite legitimately seek to protect its members from noxious uses that threaten tribal welfare or security, or from nonmember conduct on the land that does the same. But the key point is that any threat to the tribe's sovereign interests flows from changed uses or nonmember activities, rather than from the mere fact of resale. The tribe is able fully to vindicate its sovereign interests in protecting its members and preserving tribal self-government by regulating nonmember *activity* on the land, within the limits set forth in our cases. The tribe has no independent interest in restraining alienation of the land itself, and thus, no authority to do so.

Not only is regulation of fee land sale beyond the tribe's sovereign powers, it runs the risk of subjecting nonmembers to tribal regulatory authority without commensurate consent. Tribal sovereignty, it should be remembered, is "a sovereignty outside the basic structure of the Constitution." *United States* v. *Lara*, 541 U. S. 193, 212 (2004) (KENNEDY, J., concurring in judgment). The Bill of Rights does not apply to Indian tribes. See *Talton* v. *Mayes*, 163 U. S. 376, 382–385 (1896). Indian courts "differ from traditional American courts in a number of significant

respects." *Hicks*, 533 U. S., at 383 (SOUTER, J., concurring). And nonmembers have no part in tribal government—they have no say in the laws and regulations that govern tribal territory. Consequently, those laws and regulations may be fairly imposed on nonmembers only if the nonmember has consented, either expressly or by his actions. Even then, the regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations. See *Montana*, 450 U. S., at 564.

In commenting on the policy goals Congress adopted with the General Allotment Act, we noted that "[t]here is simply no suggestion" in the history of the Act "that Congress intended that the non-Indians who would settle upon alienated allotted lands would be subject to tribal regulatory authority." *Id.,* at 560, n. 9. In fact, we said it "defies common sense to suppose" that Congress meant to subject non-Indians to tribal jurisdiction simply by virtue of the nonmember's purchase of land in fee simple. *Ibid.* If Congress did not anticipate tribal jurisdiction would run with the land, we see no reason why a nonmember would think so either.

The Longs point out that the Bank in this case could hardly have been surprised by the Tribe's assertion of regulatory power over the parties' business dealings. The Bank, after all, had "lengthy on-reservation commercial relationships with the Long Company." Brief for Respondents 40. JUSTICE GINSBURG echoes this point. See *post*, at 4. But as we have emphasized repeatedly in this context, when it comes to tribal regulatory authority, it is not "in for a penny, in for a Pound." *Atkinson*, 532 U. S., at 656 (internal quotation marks omitted). The Bank may reasonably have anticipated that its various commercial dealings with the Longs could trigger tribal authority to regulate those transactions—a question we need not and do not decide. But there is no reason the Bank should

have anticipated that its general business dealings with
respondents would permit the Tribe to regulate the Bank's
sale of land it owned in fee simple.

Even the courts below recognized that the Longs' dis-
crimination claim was a "novel" one. 491 F. 3d, at 892. It
arose "directly from Lakota tradition as embedded in
Cheyenne River Sioux tradition and custom," including
the Lakota "sense of justice, fair play and decency to oth-
ers." 440 F. Supp. 2d, at 1082 (internal quotation marks
omitted). The upshot was to require the Bank to offer the
same terms of sale to a prospective buyer who had de-
faulted in several previous transactions with the Bank as
it offered to a different buyer without such a history of
default. This is surely not a typical regulation. But what-
ever the Bank anticipated, whatever "consensual relation-
ship" may have been established through the Bank's
dealing with the Longs, the jurisdictional consequences of
that relationship cannot extend to the Bank's subsequent
sale of its fee land.

The Longs acknowledge, if obliquely, the critical impor-
tance of land status. They emphasize that the Long Com-
pany "operated on reservation fee and trust lands," Brief
for Respondents 40, and n. 24, 41, and note that "the fee
land at issue in the lease-repurchase agreement" had
previously belonged to a tribal member, *id.*, at 47. These
facts, however, do not change the status of the land at the
time of the challenged sale. Regardless of where the Long
Company operated, the fee land whose sale the Longs seek
to restrain was owned by the Bank at the relevant time.
And indeed, before that, it was owned by Kenneth Long, a
non-Indian. See *Hicks, supra*, at 382, n. 4 (SOUTER, J.,
concurring) ("Land status . . . might well have an impact
under one (or perhaps both) of the *Montana* exceptions"),
*Atkinson, supra*, at 659 (SOUTER, J., concurring) (status of
territory as "tribal or fee land may have much to do (as it
does here) with the likelihood (or not) that facts will exist

that are relevant under the [*Montana*] exceptions").

The Longs attempt to salvage their position by arguing that the discrimination claim is best read to challenge the Bank's whole course of commercial dealings with the Longs stretching back over a decade—not just the sale of the fee land. Brief for Respondents 44. That argument is unavailing. The Longs are the first to point out that their breach-of-contract and bad-faith claims, which *do* involve the Bank's course of dealings, are not before this Court. *Ibid*. Only the discrimination claim is before us and that claim is tied specifically to the sale of the fee land.[2] *Ibid.* Count six of the Longs' amended complaint in the Tribal Court alleges that "*[i]n selling the Longs' land*, [Plains Commerce Bank] unfairly discriminated against the Company and the Longs." App. 172–173 (emphasis added). As relief, the Longs claimed they "should get possession and title to their land back." *Id.*, at 173. The Longs' discrimination claim, in short, is an attempt to regulate the terms on which the Bank may sell the land it owns.[3]

Such regulation is outside the scope of a tribe's sovereign authority. JUSTICE GINSBURG asserts that if "[t]he Federal Government and every State, county, and munici-

_____

[2] JUSTICE GINSBURG contends that if the Tribal Court has jurisdiction over the Longs' other claims, it is hard to understand why jurisdiction would not also extend to the discrimination claim. *Post*, at 8. First, we have not said the Tribal Court has jurisdiction over the other claims: That question is not before us and we decline to speculate as to its answer. Moreover, the claims on which the Longs prevailed concern breach of a loan agreement, see App. 190, and bad faith in connection with Bureau of Indian Affairs loan guarantees, see *id.*, at 192. The present claim involves substantive regulation of the sale of fee land.

[3] We point to the relief requested by the Longs—and partially granted by the Tribal Court—to rebut the Longs' contention that their claim did not focus on the sale of the fee land. Contrary to JUSTICE GINSBURG's assertion, however, the nature of this remedy does not drive our jurisdictional ruling. See *post*, at 11–12. The remedy is invalid because there is no jurisdiction, not the other way around.

pality can make nondiscrimination the law governing . . .
real property transactions," tribes should be able to do so
as well. *Post*, at 8. This argument completely overlooks
the very reason cases like *Montana* and this one arise:
Tribal jurisdiction, unlike the jurisdiction of the other
governmental entities cited by JUSTICE GINSBURG, gener-
ally does not extend to nonmembers. See *Montana*, *supra*,
at 565. The sovereign authority of Indian tribes is limited
in ways state and federal authority is not. Contrary to
JUSTICE GINSBURG's suggestion, that bedrock principle
does not vary depending on the desirability of a particular
regulation.

*Montana* provides that, in certain circumstances, tribes
may exercise authority over the conduct of nonmembers,
even if that conduct takes place on non-Indian fee land.
But conduct taking place on the land and the sale of the
land are two very different things. The Cheyenne River
Sioux Tribe lost the authority to restrain the sale of fee
simple parcels inside their borders when the land was sold
as part of the 1908 Allotment Act. Nothing in *Montana*
gives it back.

C

Neither the District Court nor the Court of Appeals
relied for its decision on the second *Montana* exception.
The Eighth Circuit declined to address the exception's
applicability, see 491 F. 3d, at 888, n. 7, while the District
Court strongly suggested in passing that the second excep-
tion would not apply here, see 440 F. Supp. 2d, at 1077.
The District Court is correct, for the same reasons we
explained above. The second *Montana* exception stems
from the same sovereign interests that give rise to the
first, interests that do not reach to regulating the sale of
non-Indian fee land.

The second exception authorizes the tribe to exercise
civil jurisdiction when non-Indians' "conduct" menaces the

"political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U. S., at 566. The conduct must do more than injure the tribe, it must "imperil the subsistence" of the tribal community. *Ibid.* One commentator has noted that "th[e] elevated threshold for application of the second *Montana* exception suggests that tribal power must be necessary to avert catastrophic consequences." Cohen §4.02[3][c], at 232, n. 220.

The sale of formerly Indian-owned fee land to a third party is quite possibly disappointing to the tribe, but cannot fairly be called "catastrophic" for tribal self-government. See *Strate*, 520 U. S., at 459. The land in question here has been owned by a non-Indian party for at least 50 years, Brief for Respondents 4, during which time the project of tribal self-government has proceeded without interruption. The land's resale to another non-Indian hardly "imperil[s] the subsistence or welfare of the tribe." *Montana*, *supra*, at 566. Accordingly, we hold the second *Montana* exception inapplicable in this case.

D

Finally, we address the Longs' argument that the Bank consented to tribal court jurisdiction over the discrimination claim by seeking the assistance of tribal courts in serving a notice to quit. Brief for Respondents 44–46. When the Longs refused to vacate the land, the Bank initiated eviction proceedings in South Dakota state court. The Bank then asked the Tribal Court to appoint a process server able to reach the Longs. Seeking the Tribal Court's aid in serving process on tribal members for a pending state-court action does not, we think, constitute consent to future litigation in the Tribal Court. Notably, when the Longs did file their complaint against the Bank in Tribal Court, the Bank promptly contended in its answer that the court lacked jurisdiction. Brief for United States as *Amicus Curiae* 7. Under these circumstances, we find that

the Bank did not consent by its litigation conduct to tribal court jurisdiction over the Longs' discrimination claim.

*    *    *

The judgment of the Court of Appeals for the Eighth Circuit is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 07–411

PLAINS COMMERCE BANK, PETITIONER *v.* LONG
FAMILY LAND AND CATTLE COMPANY,
INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[June 25, 2008]

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, concurring in part, concurring in the judgment in part, and dissenting in part.

I agree with the Court that petitioner Plains Commerce Bank (Bank) has Article III standing to contest the jurisdiction of the Cheyenne River Sioux Tribal Court, and therefore join Part II of the Court's opinion. Further, I take no issue with the Court's jurisdictional ruling insofar as it relates to the Tribal Court's supplemental judgment. In that judgment, the Tribal Court ordered the Bank to give Ronnie and Lila Long an option to repurchase fee land the Bank had already contracted to sell to non-Indian individuals. See App. to Pet. for Cert. A–69 to A–71.

I dissent from the Court's decision, however, to the extent that it overturns the Tribal Court's principal judgment awarding the Longs damages in the amount of $750,000 plus interest. See App. 194–196. That judgment did not disturb the Bank's sale of fee land to non-Indians. It simply responded to the claim that the Bank, in its on-reservation commercial dealings with the Longs, treated them disadvantageously because of their tribal affiliation and racial identity. A claim of that genre, I would hold, is one the Tribal Court is competent to adjudicate. As the

Court of Appeals correctly understood, the Longs' case, at heart, is not about "the sale of fee land on a tribal reservation by a non-Indian bank to non-Indian individuals," *ante*, at 1. "Rather, this case is about the power of the Tribe to hold nonmembers like the bank to a minimum standard of fairness when they voluntarily deal with tribal members." 491 F. 3d 878, 887 (CA8 2007) (case below).

As the basis for their discrimination claim, the Longs essentially asserted that the Bank offered them terms and conditions on land-financing transactions less favorable than the terms and conditions offered to non-Indians. Although the Tribal Court could not reinstate the Longs as owners of the ranch lands that had been in their family for decades, that court could hold the Bank answerable in damages, the law's traditional remedy for the tortious injury the Longs experienced.

I

In the pathmarking case, *Montana* v. *United States,* 450 U. S. 544, 564–565 (1981), this Court restated that, absent a treaty or statute, Indian tribes generally lack authority to regulate the activities of nonmembers. While stating the general rule, *Montana* also identified two exceptions:

> "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.*, at 565–566 (citations omitted).

These two exceptions, *Montana* explained, recognize that

"Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, *even on non-Indian fee lands*." *Id.,* at 565 (emphasis added).

*Montana* specifically addressed the regulatory jurisdiction of tribes. See *id.,* at 557. This Court has since clarified that when a tribe has authority to regulate the activity of nonmembers, tribal courts presumably have adjudicatory authority over disputes arising out of that activity. See *Strate* v. *A–1 Contractors*, 520 U. S. 438, 453 (1997) (as to nonmembers, a tribe's adjudicative jurisdiction coincides with its legislative jurisdiction). In my view, this is a clear case for application of *Montana*'s first or "consensual relationships" exception. I therefore do not reach the Longs' alternative argument that their complaint also fits within *Montana*'s second exception.

Ronnie and Lila Long, husband and wife and owners of the Long Family Land and Cattle Company (Long Company), are enrolled members of the Cheyenne River Sioux Tribe. Although the Long Company was incorporated in South Dakota, the enterprise "was overwhelmingly tribal in character, as were its interactions with the bank." 491 F. 3d, at 886. All Long Company property was situated—and all operations of the enterprise occurred—within the Cheyenne River Sioux Indian Reservation. The Long Company's articles of incorporation required Indian ownership of a majority of the corporation's shares. This requirement reflected the Long Company's status as an Indian-owned business entity eligible for Bureau of Indian Affairs (BIA) loan guarantees. See 25 CFR §103.25 (2007) (requiring at least 51% Indian ownership). Loan guarantees are among the incentives the BIA offers to promote the development of on-reservation Indian enterprises. The Long Company "was formed to take advantage of [the] BIA incentives." 491 F. 3d, at 886.

The history of the Bank's commercial dealings with the

Long Company and the Long family is lengthy and com-
plex. The business relationship dates from 1988, when
Ronnie Long's parents—one of them a member of the
Tribe—mortgaged some 2,230 acres of land to the Bank to
gain working capital for the ranch. As security for the
Bank's loans over the years, the Longs mortgaged both
their land and their personal property. The Bank bene-
fited significantly from the Long Company's status as an
Indian-owned business entity, for the BIA loan guarantees
"allowed [it] to greatly reduce its lending risk." *Ibid.*
Eventually, the Bank collected from the BIA almost
$400,000, more than 80% of the net losses resulting from
its loans to the Longs. See 440 F. Supp. 2d 1070, 1078 (SD
2007) (case below); App. 135–138.

   The discrimination claim here at issue rests on the
allegedly unfair conditions the Bank exacted from the
Longs when they sought loans to sustain the operation of
their ranch. Following the death of Ronnie's father, the
Bank and the Longs entered into an agreement under
which the mortgaged land would be deeded over to the
Bank in exchange for the Bank's canceling some debt and
making additional loans to keep the ranch in business.
The Longs were given a two-year lease on the property
with an option to buy the land back when the lease term
expired. Negotiating sessions for these arrangements
were held at the Tribe's on-reservation offices and were
facilitated by tribal officers and BIA employees. 491 F. 3d,
at 881.

   Viewing the deal they were given in comparative light,
the Longs charged that the Bank offered to resell ranch
land to them on terms less advantageous than those the
Bank offered in similar dealings with non-Indians. Their
claim, all courts prior to this one found, fit within the
*Montana* exception for "activities of nonmembers who
enter [into] . . . commercial dealing, contracts, leases, or
other arrangements" with tribal members. 450 U. S., at

565. Cf. *Strate*, 520 U. S., at 457 (citing *Williams* v. *Lee*, 358 U. S. 217, 223 (1959)) (*Montana*'s consensual-relationships exception justifies tribal-court adjudication of claims "arising out of on-reservation sales transaction between nonmember plaintiff and member defendants"). I am convinced that the courts below got it right.

This case, it bears emphasis, involves no unwitting outsider forced to litigate under unfamiliar rules and procedures in tribal court. Cf. *Nevada* v. *Hicks*, 533 U. S. 353, 382–385 (2001) (SOUTER, J., concurring). Hardly a stranger to the tribal court system, the Bank regularly filed suit in that forum. See Brief for Cheyenne River Sioux Tribe as *Amicus Curiae* 29–31. The Bank enlisted tribal-court aid to serve notice to quit on the Longs in connection with state-court eviction proceedings. The Bank later filed a counterclaim for eviction and motion for summary judgment in the case the Longs commenced in the Tribal Court. In its summary judgment motion, the Bank stated, without qualification, that the Tribal Court "ha[d] jurisdiction over the subject matter of this action." App. 187–188. Had the Bank wanted to avoid responding in tribal court or the application of tribal law, the means were readily at hand: The Bank could have included forum selection, choice-of-law, or arbitration clauses in its agreements with the Longs, which the Bank drafted. See Brief for Respondents 42.

## II

Resolving this case on a ground neither argued nor addressed below, the Court holds that a tribe may not impose any regulation—not even a nondiscrimination requirement—on a bank's dealings with tribal members regarding on-reservation fee lands. See *ante*, at 1, 21–22. I do not read *Montana* or any other case so to instruct, and find the Court's position perplexing.

First, I question the Court's separation of land sales tied

to lending activities from other "activities of nonmembers who enter consensual relationships with the tribe or its members," *Montana*, 450 U. S., at 565. Sales of land—and related conduct—are surely "activities" within the ordinary sense of the word. See, *e.g., County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251, 269 (1992) ("The excise tax remains a tax upon the Indian's *activity* of selling the land . . . ." (emphasis added)). Cf. 14 Oxford English Dictionary 388 (2d ed. 1989) (defining "sale" as "[t]he action or an act of selling" (def. 1(a))).

Second, the Court notes the absence of any case "f[i]nd[ing] that *Montana* authorized a tribe to regulate the sale of [non-Indian fee] land." *Ante*, at 15. But neither have we held that *Montana* prohibits all such regulation. If the Court in *Montana*, or later cases, had intended to remove land sales resulting from loan transactions entirely from tribal governance, it could have spoken plainly to that effect. Instead, *Montana* listed as examples of consensual relationships that tribes might have authority to regulate "commercial dealing, contracts, [and] leases." 450 U. S., at 565. Presumably, the reference to "leases" includes leases of fee land. But why should a nonmember's lease of fee land to a member be differentiated, for *Montana* exception purposes, from a sale of the same land? And why would the enforcement of an antidiscrimination command be less important to tribal self-rule and dignity, cf. *ante*, at 16–18, when the command relates to land sales than when it relates to other commercial relationships between nonmembers and members?

## III

As earlier observed, see *supra*, at 1, I agree that the Tribal Court had no authority to grant the Longs an option to purchase the 960-acre parcel the Bank had contracted to sell to individuals unaffiliated with the Tribe.

The third parties' contracts with the Bank cannot be disturbed based on *Montana*'s exception for "the activities of nonmembers who enter consensual relationships with the tribe or its members." 450 U. S., at 565. Although the Tribal Court overstepped in its supplemental judgment ordering the Bank to give the Longs an option to purchase land third parties had contracted to buy, see App. to Pet. for Cert. A–69 to A–71, it scarcely follows that the Tribal Court lacked jurisdiction to adjudicate the Longs' discrimination claim, and to order in its principal judgment, see App. 194–196, monetary relief.[1]

The Court recognizes that "[t]he Bank may reasonably have anticipated that its various commercial dealings with the Longs could trigger tribal authority to regulate those transactions." *Ante*, at 19. Today's decision, furthermore, purports to leave the Longs' breach-of-contract and bad-faith claims untouched. *Ante,* at 21, n. 2. Noting that the Bank "does not presently challenge the breach-of-contract verdict," *ante,* at 6, the Court emphasizes that "[o]nly the discrimination claim is before us and that claim is tied specifically to the sale of the fee land," *ante,* at 21. But if the Tribal Court is a proper forum for the Longs' claim that the Bank has broken its promise or acted deceptively in the land-financing transactions at issue, one is hard put to understand why the Tribe could not likewise enforce in its courts a law that commands: Thou shall not discriminate against tribal members in the terms and conditions

---

[1] The Longs joined their discrimination claim with claims of breach of contract and bad-faith dealings. The jury found in favor of the Longs on all three claims. App. 190–192. The latter claims alleged that the Bank "never provided the . . . operating loans" promised during the parties' negotiations. 491 F. 3d 878, 882 (CA8 2007). "[A]s a result," the Longs asserted, "the company was not able [to] sustain its ranching operation through the particularly harsh winter of 1996–97." *Ibid.* Nothing in the Court's opinion precludes decision of those claims by the Tribal Court. See *ante*, at 6, 8, 21, n. 2.

you offer them in those same transactions. The Federal
Government and every State, county, and municipality
can make nondiscrimination the law governing contracts
generally, and real property transactions in particular.
See, *e.g.,* 42 U. S. C. §§1981, 1982. Why should the Tribe
lack comparable authority to shield its members against
discrimination by those engaging in on-reservation com-
mercial relationships—including land-secured lending—
with them?

## A

The "fighting issue" in the tribal trial court, the Eighth
Circuit underscored, "was whether the bank denied the
Longs favorable terms on a deal solely on the basis of their
race or tribal affiliation." 491 F. 3d, at 891. The Longs
maintained that the Bank initially offered them more
favorable terms, proposing to sell the mortgaged land back
to them with a 20-year contract for deed. Thereafter, the
Bank sent a letter to Ronnie Long withdrawing its initial
offer, "citing 'possible jurisdictional problems' posed by the
Long Company's status as an 'Indian owned entity on the
reservation.'" *Id.*, at 882 (quoting Letter from Charles
Simon, Vice President, Bank of Hoven, to Ronnie Long
(Apr. 26, 1996), App. 91). In the final agreement, the
Bank promised no long-term financing; instead, it gave the
Longs only a two-year lease with an option to purchase
that required a large balloon payment within 60 days of
the lease's expiration. When the Longs were unable to
make the required payment within the specified deadline,
the Bank sold the land to nonmembers on more favorable
terms.

In their complaint, the Longs alleged that the Bank
allowed the non-Indians "ten years to pay for the land, but
the bank would not permit [the] Longs even 60 days to pay
for their land," and that "[s]uch unfair discrimination by
the bank prevented the Longs and the [Long] Company

from buying back their land from the bank." App. 173. Although the allegations about the Bank's contracts to sell to nonmembers were central to the Longs' lawsuit, those transactions with third parties were not the wrong about which the Longs complained. Rather, as the tribal trial court observed, the contracts with nonmembers simply supplied "*evidence* that the Bank denied the Longs the privilege of contracting for a deed because of their status as tribal members." App. to Pet. for Cert. A–78 to A–79 (emphasis added).

The Tribal Court instructed the jury to hold the Bank liable on the discrimination claim only if the less favorable terms given to the Longs rested "solely" upon the Longs' "race or tribal identity." 491 F. 3d, at 883 (internal quotation marks omitted). In response to a special interrogatory, the jury found that "the Defendant Bank intentionally discriminate[d] against the Plaintiffs Ronnie and Lila Long [in the lease with option to purchase] based solely upon their status as Indians or tribal members." App. 191. Neither the instruction nor the special finding necessitated regulation of, or interference with, the Bank's fee-land sales to non-Indian individuals. See *ante*, at 1.[2]

Tellingly, the Bank's principal jurisdictional argument

_____

[2] The Court criticizes the Tribal Court for "requir[ing] the Bank to offer the same terms of sale to a prospective buyer who had defaulted in several previous transactions with the Bank as it offered to a different buyer without such a history of default." *Ante*, at 20. That criticism is unfair. First, the record does not confirm that the Longs were riskier buyers than the nonmembers to whom the Bank eventually sold the land. Overlooked by the Court, the Bank's loans to the Longs were sheltered by BIA loan guarantees. See *supra*, at 3–4. Further, a determination that the Longs had encountered intentional discrimination based solely on their status as tribal members in no way inhibited the Bank from differentiating evenhandedly among borrowers based on their creditworthiness. The proscription of discrimination simply required the Bank to offer the Longs the same terms it would have offered *similarly situated* non-Indians.

below bore no relationship to the position the Court embraces. The Bank recognized that the Longs were indeed complaining about discriminatory conduct of a familiar sort. Cf. *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 413 (1968) (42 U. S. C. §1982 "bars *all* racial discrimination . . . in the sale or rental of property"). In *Hicks*, 533 U. S. 353, this Court held that tribal courts could not exercise jurisdiction over a claim arising under federal law, in that case, 42 U. S. C. §1983. Relying on *Hicks*, the Bank insisted that the Longs' discrimination claim could not be heard in tribal court because it arose under well-known federal antidiscrimination law, specifically, 42 U. S. C. §1981 or §2000d. 491 F. 3d, at 882–883. The Tribal Court of Appeals, however, held that the claim arose under Lakota common law, which resembled federal and state antidiscrimination measures. See App. to Pet. for Cert. A– 54 to A–55, and n. 5.[3]

B

The Longs requested a remedy the Tribal Court did not have authority to grant—namely, an option to repurchase land the Bank had already contracted to sell to nonmem-

_____

[3] The Court types the Longs' discrimination claim as "'novel,'" *ante*, at 20 (quoting 491 F. 3d, at 892), because the Tribal Court of Appeals derived the applicable law "'directly from Lakota tradition,'" *ante*, at 20 (quoting 440 F. Supp. 2d 1070, 1082 (SD 2007) (case below)). Concerning the content of the Tribe's law, however, the appeals court drew not only from "Tribal tradition and custom," it also looked to federal and state law. See App. to Pet. for Cert. A–55. Just as state courts may draw upon federal law when appropriate, see, *e.g.*, *Dawson* v. *Birenbaum*, 968 S. W. 2d 663, 666–667 (Ky. 1998), and federal courts may look to state law to fill gaps, see, *e.g.*, *United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715, 728–730 (1979), so too may tribal courts "borrow from the law of . . . the federal government," see F. Cohen, Handbook of Federal Indian Law §4.05[1], p. 275 (2005 ed.). With regard to checks against discrimination, as the Tribal Court of Appeals observed, "there is a direct and laudable convergence of federal, state, and tribal concern." App. to Pet. for Cert. A–55 to A–56.

ber third parties. See *supra*, at 6–7. That limitation, however, does not affect the court's jurisdiction to hear the Longs' discrimination claim and to award damages on that claim. "The nature of the relief available after jurisdiction attaches is, of course, different from the question whether there is jurisdiction to adjudicate the controversy." *Avco Corp.* v. *Machinists*, 390 U. S. 557, 561 (1968). See also *Davis* v. *Passman*, 442 U. S. 228, 239– 240, n. 18 (1979) ("*[J]urisdiction* is a question of whether a federal court has the power . . . to hear a case"; "*relief* is a question of the various remedies a federal court may make available.").

Under the procedural rules applicable in Cheyenne River Sioux Tribal Courts, as under the Federal Rules, demand for one form of relief does not confine a trial court's remedial authority. See Law and Order Code of Cheyenne River Sioux Tribe, Rule Civ. Proc. 25(c)(1) ("[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if such relief is not demanded in the pleadings."); Fed. Rule Civ. Proc. 54(c) (materially identical). A court does not lose jurisdiction over a claim merely because it lacks authority to provide the form of relief a party primarily demands. See *Avco*, 390 U. S., at 560–561; 10 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2664, pp. 181– 182 (3d ed. 1998) ("[I]t is not . . . the type of relief requested in the demand that determines whether the court has jurisdiction.").[4] In such a case, authority to provide another remedy suffices to permit the court to adjudicate the merits of the claim. See *Avco*, 390 U. S., at 560–561.

––––––––––

[4] As in this case, see App. 177–179, the complaint in *Avco* sought injunctive relief, but also included a residual clause asking for other relief, see *Avco Corp.* v. *Aero Lodge No. 735, Int'l Assn. of Mach. and Aerospace Workers*, 376 F. 2d 337, 339 (CA6 1967).

\*      \*      \*

For the reasons stated, I would leave undisturbed the Tribal Court's initial judgment, see App. 194–196, awarding the Longs damages, prejudgment interest, and costs as redress for the Bank's breach of contract, bad faith, and discrimination.  Accordingly, I would affirm in large part the judgment of the Court of Appeals.